## Coyne v. Pittsburgh Railways Company, Appellant.

Argued March 26, 1958.   Before Jones, C. J., Bell, Chidsey, Musmanno, Arnold, Jones and Cohen, JJ.

reargument refused June 11, 1958.

*Earl W. Brieger,* for defendant appellant.

*Emanuel Goldberg,* with him *Pringle, Bredin & Martin* for plaintiffs, appellees.

*John David Rhodes,* for defendant, appellee.

Opinion by Mr. Justice Musmanno, May 2, 1958:

Aleen Coyne, 19 years of age, was struck and injured by an automobile when she alighted from a street car which had been travelling eastwardly on East Carson Street in Pittsburgh and had stopped near a T-intersection known as Terminal Way. She and her parents brought an action in trespass against the Pittsburgh Railways Company and the operator of the involved automobile, Charles Baier. The jury returned a verdict in favor of the plaintiffs and against both defendants. The defendant railways company has

appealed seeking judgment n.o.v. or a new trial. The defendant Baier did not appeal.

The railways company argues that the plaintiffs failed to show that the motorman of the street car committed any act of negligence and, if he did, it was not established that the negligence was the proximate cause of Aileen Coyne's injuries. Reading the record in the light most favorable to the verdict-winners, as we are required to do in considering a motion for judgment n.o.v., the following recital of events emerges.

On the evening of October 20, 1951, at about 8 o'clock, Aileen Coyne boarded a No. 50 street car on Carson Street with the intention of getting off at Terminal Way where she was to meet other girls with whom she was going to the movies. She took a seat in the middle of the car and then, when it got to Third Street, which was the regular car stop immediately prior to the Terminal Way stop, she advanced to the front of the car and handed the motorman her transfer ticket. She turned and faced the doors, awaiting the car's arrival at her destination. There was nothing to visually apprise her of the Terminal Way stop since Carson Street at this stretch of the thoroughfare on its southern side (which she was facing) is shadowed by a massive 20-foot-high retaining stone wall which offers no marking or architectural feature to designate the Terminal Way stop. The car ground to a halt, the motorman threw open the doors, the girl descended to the street and took two or three steps on the pavement when she was violently struck in the rear by an automobile which had been following the street car for some distance but which, as the car passed Terminal Way, moved abreast and alongside the car. The plaintiffs presented evidence to show that the street car ignored the Terminal Way stop and proceeded to a point 90 feet beyond it, where the motorman discharged

Miss Coyne at the moment that the automobile, having swung around the rear of the car, was now seeking to pass it, the driver believing that the car, since it had passed Terminal Way, would now unabatedly continue on its way up Carson Street. With this showing of evidence, the plaintiffs contended that the motorman was guilty of a specific act of negligence in that, after having failed to halt his car at a regular car stop, he discharged his passenger at a manifestly dangerous spot.

The defendant company denied that its street car had not stopped at Terminal Way and called witnesses who testified that it was precisely at Terminal Way that the collision between Baier's automobile and Miss Coyne occurred. Of course, these diametrically opposing stories as to whether the car did or did not stop at Terminal Way passed through the crucible of the jury's deliberations and fused in the verdict which now proclaims on the imperishable tablets of a factual finding that the street car disregarded the Terminal Way stop. Thus, we have no question on this appeal *where* the car stopped. We are concerned only with, whether, in taking Miss Coyne 90 feet beyond the regular stopping place, the motorman precipitated his passenger into a dangerous situation which he, with cautionary foresight, could have avoided.

The defendant company asserts that we should state, as a matter of law, that there was no danger associated with the motorman's discharging Miss Coyne at the point where she eventually alighted. This, we cannot do. In the way stands established principles of law as unsurmountable as the Chinese Wall which confronted Miss Coyne as she left the car. In the case of *O'Malley v. Laurel Line Bus Co.*, 311 Pa. 251, 254, we said "It is clear that the defendant was guilty of negligence. 'A common carrier for hire owes to its

passengers the *highest degree of care* and diligence in carrying them to their destination and (in) *enabling them to alight safely*" (Hughes v. Pittsburgh Transportation Co., 300 Pa. 55, 150 A. 153) and *to avoid any possible danger* while doing so. Lyons v. Pittsburgh Railways Co., 301 Pa. 499, 152 A. 687. It is the duty of a carrier of passengers to set them down at the Terminus of their journey, and to afford them a sufficient time to alight in safety. If for any cause the carrier makes its stop short of or *beyond the point where it knows the passenger desires to alight, it should give him notice of the fact before he attempts to leave the car, and a failure so to do is a violation of duty for which the carrier may be held responsible.*" (Emphasis supplied).

In *Lyons v. Pittsburgh Rys. Co.*, 301 Pa. 499, we also said: "It was defendant's duty not only to carry plaintiffs safely but to *afford them an opportunity to alight and pass out of danger.*" (Emphasis supplied).

In view of what the record in this case discloses it would be visionary to assume that we could declare as an indisputable legal proposition that the motorman used the "highest degree of care" in what he did. There is evidence to show that the Terminal Way stop on the southern side of Carson Street is at its best a hazardous spot at which to wait for or alight from a street car. The towering stone wall is only eleven feet distant from the car track, thus allowing but a restrictive space for the passage of automobiles. A pedestrian caught at this point with both a street car and automobile occupying their respective lanes of travel could only find safety against the base of the wall on a ledge about 12 inches wide, which allowed standing room for only the thinnest of travelers.

Passengers intending to board the street car at Terminal Way on the southern side of Carson Street

did not wait at that southern side with its frowning, bleak stone barrier where they would be the prey of passing vehicles, the target of splashing mud, and the victim of inclement weather from which there was no refuge. They bided their time on the northern side of Carson Street with its wide sidewalks, houses and stores, and companionable atmosphere. When they saw their street car bowling eastwardly along Carson Street toward the Terminal Way stop, they would prepare to cross the street, and, with traffic permitting, traverse the car tracks to the boarding point. The area was so generally accepted as dangerous that the City of Pittsburgh stationed a policeman there by day. During the daylight hours both sides of the street were usually cluttered with parked automobiles so that automobiles moving on the street were compelled to trail behind the street cars. However, at night, with the southern side of the street free of parked automobiles, the mobile automobiles travelled by the side of the street cars in overtaking and passing them. All this was known to the motorman who had been operating a car on this particular route for six months and had been employed by the company for an overall period of five years. He knew, or should have known, that to discharge a passenger at night along the Chinese Wall at any point other than the regular car stop was to push that passenger into the jaws of a potential nutcracker.

Despite the assumed frigidity of the law, it cannot be denied that text books, court decisions and commentaries demonstrate that the main purpose of the law is to protect life, limb, and property and all rights appertaining thereto, from unnecessary invasion. Humanity is included within that blanket protection. There is nothing in all the law books which can possibly give support to the proposition of the appellant

that, as a legal proposition, the motorman had fulfilled every requirement of the law by opening the doors of his car; when, by a simple turning of his head for a moment he could have determined whether an automobile was approaching the spot where his passenger was about to alight.

The motorman testified as follows: "Q. Did you say anything to Miss Coyne as she alighted from the street car or before she alighted? A. No, sir. Q. Did you yourself look to see whether there was any traffic coming alongside the streetcar at the time? A. No, I didn't see any. Q. Did you look to see if there was any? A. You mean by getting up and looking out? A. No. Q. Would you have been able to see traffic moving along the right-hand side of the streetcar, that would be the side from which she alighted? Would you have been able to see traffic even from the position in which you were if you had looked? A. My mirror from inside will show perhaps the top of an automobile. Q. *If you had turned your head or turned your body slightly without getting up, could you have seen traffic in that lane?* A. Perhaps, yes." (Italics added).

The appellant argues that the motorman had no duty to look for approaching automobiles because The Vehicle Code (Act of May 1, 1929, P. L. 905, 75 P.S. 592b) provides: "No operator of a vehicle who meets or overtakes a street passenger car, that has stopped for the purpose of taking on or discharging passengers, shall pass said car on the side on which the passengers get on or off, until the car has started, and until any passengers who may have alighted have reached the side of the highway." The Vehicle Code also prohibits motorists from travelling without lighted headlamps at night, but if a motorman saw such an unlighted vehicle approaching, after discharging a passenger at

an unregular car stop, it could scarcely be argued in his behalf that he had acquitted himself, as a matter of law, of the charge of negligence if he did not warn the departing passenger of the peril bearing down upon him.

A motorman who is about to discharge passengers at a point not a regular car stop is required to exercise care commensurate with the surroundings so as to avoid introducing the passengers into any danger of which he is aware or which, by the normal functioning of his senses and a normal desire not to see harm come to others, he should be aware.

In the case of *Earl W. Baker & Co. v. Lagaly,* (C.C.A. 10th Cir.) 144 F. 2d 344, cited with approval in our case of *Vogel et al. v. Stupi et al.,* 357 Pa. 253, 259, a child was hit by a truck which came from the rear of the school bus on which the child was riding. In holding the owners of the bus liable the Federal Court said: "The driver knew that the paved highway was traveled generally; knew or should have known that the Lagaly children would immediately start across it in order to reach their home; and knew or should have known that the truck was following the bus. Yet, without exerting any effort to ascertain the condition of traffic approaching from the rear, without making any effort to ascertain the proximity of the truck, and without giving the children any warning in respect of the approaching truck, he opened the door and permitted them to alight. Considering all the facts and circumstances in their totality, the jury was warranted in finding that the driver was negligent in the operation of the bus, and that the negligence was a proximate cause of the accident."

In the case of *O'Malley v. Laurel Line Bus Co.,* supra, the principle of law under discussion was pretty well epitomized with the declaration that: "If the

person in charge of a car used for the carriage of passengers for hire, knowingly permits one of them to get off the vehicle at a dangerous place, which is not the usual stopping place, and the dangerous character of which the passenger could not see and did not know, the carrier will be liable for the resulting injuries." (p. 255)

Although the defendant company had first contended that the street car did stop at Terminal Way, it now argues on appeal that the passenger was better off in having been discharged at a point 90 feet beyond Terminal Way because lighting conditions were better at that point. If nothing else, this is an excellent exhibition of highly mobile logic. But it overlooks the fundamental fact that street car stops are established not only to notify intending passengers where they may catch cars but to warn motorists where they must exercise extraordinary care. That is the very object of the provision of The Vehicle Code cited by the appellant and quoted above.

We conclude that the jury was justified in finding, in all the circumstances of the case, that the appellant company was negligent.

The appellant then argues that even if it be assumed that it was negligent in the manner in which it transported and discharged its passenger, Aileen Coyne, this negligence was not the proximate cause of the accident. Proximate cause is peculiarly a jury question. It is usually defined as "That which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred."* A discussion of proximate cause, which necessarily involves some imponderables, does not always produce solutions of

---

* Black's Law Dictionary, p. 1391.

irrefutable mathematical perfection. History is replete with momentous events which, with but slight alteration in chronology, dramatic cast, or order of appearance of the characters, could well have drastically changed the story of mankind. What would have happened if Caesar had not crossed the Rubicon, what would have been the course of history if Blucher had not arrived on time at Waterloo, or if Hamilton had not accepted Burr's challenge to a duel? What would have happened if Baier's automobile had not come along at the fateful moment which it did? Obviously, Miss Coyne would not have been injured. But the fact remains that she was injured, and any wishful turning back of time cannot alter that reality. If the street car motorman had stopped at Terminal Way or had not opened the doors at the 90-foot mark until after Baier's car had passed, the accident would not have happened either. The street car and the automobile operated independently of one another but unconsciously concatenated to bring about the collision. In reconstructing the unfortunate mishap it is the exercise of common sense and practical reasoning,—and not elaborate and labyrinthian disputation—which determines whether or not the negligent act of the motorman was the proximate cause of the accident. It was thus strictly a question for the jury and that issue was submitted to the jury in an able and comprehensive charge, free of error.

The principle of law announced in *Hughes v. Pittsburgh T. Co.*, 300 Pa. 55, 60, can well dispose of the question here as to whether the motorman's negligence constituted proximate cause. We there said: ". . . Where there would have been no injury whatever but for the continuing negligence of the defendant who first put the plaintiff in peril, and which existed when the negligence of the other turned the peril into actual injury,

the negligences are concurrent and both defendants are jointly and severally liable for the injuries thereby occasioned."

Equally and relevant is this Court's pronouncement in the case of *Burrell Twp. v. Uncapher*, 117 Pa. 353, 363, where we said: " 'If the defendant's negligence concurred with some other event (other than the plaintiff's fault) to produce the plaintiff's injury, so that it clearly appears that but for such negligence the injury would not have happened, *and both circumstances are closely connected with the injury in the order of events*, the defendant is responsible, even though his negligent act was not the nearest cause in the order of time.' " (Emphasis in original).

Nor do we find in the record any reason for granting a new trial. The appellant complains that the Trial Judge refused to submit to the jury its requests for findings of fact. We do not see that any purpose would have been served by doing so, especially, since, as we have already said, the Trial Judge covered the factual and legal questions involved in a comprehensive manner.*

The appellant advances three other reasons for a new trial: (1) that the Trial Judge erred in allowing testimony as to how passengers boarded the street car at Terminal Way; (2) that the Court erred in allowing cross-examination as to how the motorman operated his street car; and (3) that the verdict of the jury was against the weight of the evidence. We have considered all these reasons and find that none of them individually or all of them combined, in the light of the record, justify another trial.

Judgment affirmed.

---

* *Brown v. Ambridge Yellow Cab Co.*, 374 Pa. 208.

DISSENTING OPINION BY MR. JUSTICE BELL:

Plaintiff's evidence* did not establish that the motorman let her off at a place of known or obvious danger, and consequently there was no evidence of negligence. Moreover, if the motorman in the enclosed trolley car could have seen the approaching automobile, it is obvious that plaintiff, when the trolley doors were open, could easily and more readily have seen the approaching automobile before she alighted and stepped into its path. For each of these reasons I would enter a judgment in favor of Pittsburgh Railways Company, non obstante veredicto.

Mr. Justice ARNOLD and Mr. Justice BENJAMIN R. JONES join in this dissenting opinion.

---

* If defendant's evidence were considered, there could not possibly be any recovery.